FILED

UNITED STATES DISTRICT COURT  06 AUG 16  PM 3: 03

MIDDLE DISTRICT OF FLORIDA  CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION  FT. MYERS, FLORIDA

In re WILLIAM F. TURNER, on behalf
of himself and all others similarly
situated,

        Plaintiff,

        v.

GENERAL ELECTRIC COMPANY,

        Defendant.

CASE NO.: 2:05-CV-186-FtM-33 DNF

## DECLARATION IN SUPPORT OF CATHERINE T. CANNIVET'S OBJECTIONS TO APPROVAL OF SETTLEMENT AGREEMENT, APPROVAL OF APPOINTMENT OF LEAD SETTLEMENT CLASS COUNSEL, APPROVAL OF SETTLEMENT CLASS REPRESENTATIVE, AND APPROVAL OF ATTORNEYS' FEES

### Introduction

I, Catherine T. Cannivet, declare as follows: I am a resident of Naples, Collier County, Florida. I submit this declaration in support of my Objections to: Approval of Settlement Agreement, Approval of Appointment of Lead Settlement Class Counsel, Approval of Settlement Class Representative, and Approval of Attorneys' Fees. I have personal knowledge of the facts herein and, if called to do so, could and would testify competently thereto. I make these statements based on my own personal knowledge except as to those matters made on information and belief, and, as to those matters, I believe them to be true.

**1.    Background**

In December 2004, I organized members of my community of Island Walk, Naples, Florida, in an effort to remedy the unresolved problems residents were experiencing with

General Electric ("G.E.") refrigerators sold with our homes.  Assisted by our community's

developer, DiVosta Homes, local print and broadcast media reports, we were able to negotiate

an agreement for the replacement of approximately 1,000 G.E. refrigerators, refunds for

previously paid repairs, and the promise of <u>three year warranties</u> on the <u>new</u> refrigerators due

to the level of mistrust for G.E. products and services.

 News of this effort quickly spread to surrounding communities in Collier, Lee, and

Charlotte counties.  I received a deluge of telephone calls and emails from G.E. refrigerator

owners in the tri-county area which confirmed that the defective refrigerators were not

confined to Island Walk.

 In March 2005, I submitted formal written complaints to the Florida Department of

Agriculture and Consumer Services and the U.S. Federal Trade Commission.  These

documents (exceeding 500 pages each) included community surveys, copies of extended

warranty contracts, copies of consumer correspondence to G.E. regarding their defective

refrigerators, etc.  These reports are public information available to anyone requesting copies

of their contents.  That same month I met Nancy Grogan, another dissatisfied G.E. refrigerator

owner residing in the Stoneybrook Community in Estero, Lee County, Florida.  On April 1,

2005 we launched the website www.BringGoodThingsToLife.org.

 This first website iteration was a simple platform providing information <u>to</u> the general

public about defective G.E. refrigerators and a vehicle for direct and efficient communication

<u>from</u> G.E. refrigerator owners regarding their experiences and complaints.  We received

numerous accounts consistently describing the mechanical failures of the defective

refrigerators, exorbitant repair charges, and copious reports of G.E.'s denials of after-warranty

service despite the pre-existing condition status of the defect <u>during</u> the warranty period.  G.E. repeatedly lied to consumers that they (G.E.) had "never heard of their problem with their particular model before" and/or "the moisture-related program was for Island Walk residents only" after admitting on television news reports that they (G.E.) were aware of these problems which were common and due to hot, humid environments such as south Florida.

After learning about the class action lawsuit filed on April 29, 2005, I initiated contact with Lead Settlement Class Counsel Scott W. Weinstein on or about May 10, 2005.  After describing to Mr. Weinstein the scope of our experience and documentation of events thus far, we agreed to meet at my home in Naples, Florida on May 25, 2006.  Mr. Weinstein was accompanied by Mr. Jordan Chaikin and Mr. Alexander Barnett, co-counsel.  In addition, we invited the attorneys to a community meeting on May 26, 2005 for the opportunity of addressing more than 100 community leaders and local media regarding the litigation.

Although rocky at first, the relationship with Mr. Weinstein progressed reasonably well.  For the first few months or so, we communicated directly with Mr. Weinstein relaying information, leads, etc.  The evening before his first negotiation meeting with G.E. in Louisville, Kentucky in June 2005, I coached him via telephone in preparation for the meeting.  I delineated the specific identities of the companies and databases that contained information about G.E. customer names, customer service records, repairs, replacement parts, warranty records, etc. that would be critical and necessary to the discovery process.  I cautioned him against blindly relying on G.E. to provide accurate or complete records.  By this point in time I was already acutely aware of service records mysteriously missing or capriciously mishandled.

Subsequent to that meeting (and mysteriously), Mr. Weinstein's willingness to *entertain* the relevance of information and evidence we offered diminished precipitously. It became increasingly difficult to convince him of the import or scope of much of this information and evidence. By late summer, Mr. Weinstein refused to communicate with me and my partner any further. He seemed to have forgotten that I was a member of the class he represented. His refusal to receive information and evidence, or to answer my questions seemed contradictory to his role and obligation to thoroughly, diligently, and extensively investigate and research the facts. Moreover, by refusing (by avoidance) concrete evidence, he appeared to rely exclusively upon the information provided by the Defendant.

By early Fall 2005, Mr. Weinstein had completely ceased communicating with us. Yet we continued to accumulate important information from many sources. By this point in time, we believed we had amassed sufficient evidence to warrant investigation into G.E.'s business practices. This information was too important to ignore and we believed directly affected the class action lawsuit. We believed it to be our responsibility to provide this information to a proper authority in light of Mr. Weinstein's refusals and lack of interest. Therefore, on October 3, 2005 we delivered a 2,000+ page report to the Florida Attorney General, Office of Economic Crimes in Tampa, Florida.[1]

By April 2006 (predominantly via the website), we had received more than 2,000 individual community surveys, letters, and telephone calls from Collier, Lee, and Charlotte counties alone. We hosted two open meetings drawing more than 100 community representatives from the tri-county area at each meeting. These meetings were also

---

[1] Since October 3, 2005 four supplements have been filed with the Florida Attorney General, Office of Economic Crimes in Tampa, Florida. These supplements bring the total pages of information, evidence, and exhibits to almost 3,000 pages.

extensively reported in detail by the local media. In addition, over 3,500 discrete communications from individual consumers representing the U.S. and Canada were received. Between April 1, 2005 and August 10, 2006, more than 800,000 people have visited our website. We have also received confidential advisory and *educational* communications from current and former G.E. technicians, engineers, and labor union members. Over the course of these twenty months, we have investigated and researched information which has uncovered important evidence critical to this litigation.

Due to the aforementioned experience, events, and research, we have been able to collect and document information regarding specific model defects. In addition, we have been able to trace the myriad sources and avenues G.E. uses when collecting consumer information and archiving service records. Furthermore, G.E. is quick to provide hidden warranty and service programs to commercial customers such as home builders and appliance retailers, but denies the same remedies to individual consumers.

I never expected a perfect settlement. I understood that this was a compromise settlement limited in its scope of included models, protective provisions for the class members, and was glaringly deficient in a clear and responsible warning to consumers of the important health and safety risks associated with the defects that could potentially cause illness, injury, or death. The Settlement lacked specific definitions of the actual diagnoses of the defects, the specific parts involved, and the specific repairs that constitute a moisture-related problem or moisture-related repair. The Settlement Agreement and Notification only described moisture-related <u>symptoms</u>.

Issues that should have been more clearly defined and addressed were not. Therefore, I had serious concerns about the pitfalls and conflicts inherent in the Settlement Notification Program, G.E.'s administration of the benefits, and G.E.'s performance of the terms both within the letter and the *spirit* of the Settlement. Only someone with my unique perspective, experience, and knowledge of and in this situation would be able to see the flaws that G.E. could (and most likely would) exploit to circumvent their legal responsibilities to the Class Members. General Electric's pattern of behavior in dealing with the owners of these defective refrigerators was negligent at best and criminal at worst.

Nevertheless, I did not object to the Settlement Agreement by March 14, 2006. In the interest of a quick and appropriate remedy for as many consumers as possible, I put aside my concerns, hesitations, doubts, and suspicions.

It is very important that the Court understand this: I believed the benefits promised in the Settlement Agreement – on its face – *were exceedingly fair, reasonable, and adequate.* Not only would the specific benefits remedy and rectify any concerns or problems a consumer had experienced, or might experience in the near future with their defective refrigerators, but would also reimburse Class Members for out of pocket expenses incurred for repairs or replacement units, and give them an additional year of warranty protection. This was not a notorious "coupon settlement". After carefully weighing the issues, I concluded that I had to trust Class Counsel and hope that supervision by the Court of the judicial process would serve the greater good for the greatest number of people. That the majority of Class Members would receive proper notification, and be treated fairly, honestly, and with respect by G.E. My hopes were dashed, but I was *never* surprised.

2.      **Objections to Settlement**

**2.1.**   *Objector objects to the approval of this settlement because General Electric has a financial incentive to fail to locate and notify class members. The notification process continues to be flawed and insufficient. Missing service records combined with missing databases renders the notification process inadequate and therefore the settlement is not fair, reasonable, or adequate.*

   **2.1.1.**  It has already been established that the initial notification process was seriously flawed. Subsequent direct mailings for previously omitted databases "discovered only hours before" the April 27, 2006 Fairness Hearing resulted in 271,000 additional notification packages to be mailed. I believe this *discovery* was a direct result of my comments to Mr. Weinstein in the courtroom hallway less than 30 minutes before the Hearing.

   **2.1.2.**  G.E.'s authority under the Settlement Agreement to rely on its own records to identify and notify class members is fundamentally wrong. G.E. stated in affidavits to the Court, that they are not a direct to the public seller of appliances. Their products are sold predominantly through appliance retailers such as Sears, Home Depot, Lowes, Best Buy, and Sam's Club and home builders such as US Homes, Pulte, DiVosta, etc.

   **2.1.3.**  The aforementioned appliance retailers and home builders, as well as G.E. authorized service companies have vast national databases of refrigerator owner information and appear to have never been considered as a source to access for notification purposes.

**2.1.4.**  G.E. intentionally relied on warranty and service records they knew to be incomplete and insufficient for the Notification Program.  Given the documented problem of missing service records that has been rampant since before the Settlement, any notification program dependent on G.E.'s recollection or retrieval of records is doomed to fail through gross omission.

**2.1.5.**  G.E.'s national print notification was a bad joke played on consumers. It is impossible to reconcile how one of the world's largest media conglomerates would not avail themselves of the services of competent advertising professionals for the notification to consumers of the Settlement Agreement.  Considering the popularity (and media attention) of G.E.'s *Ecomagination Dancing Elephant* campaign, G.E. obviously knows who to call when they are serious about engaging the public's attention.  The printed notices in national publications such as Reader's Digest, Parade Magazine, People Magazine, etc. were as visually attractive and stimulating as a package insert for a prescription drug.  The typeface size required a magnifying glass for those with average visual acuity.  There was no eye catching title indicating the notice was about G.E. refrigerators.

**2.1.6.**  Objector realizes that the public relations campaign that G.E. produced as a result of the 1999 defective dishwasher recall was ordered and enforced by the Attorney General of the State of New York, the comprehensive television, radio, and print ad notices could not be missed.  And while Objector does not intend to minimize the problem dishwashers, the dangers associated with those

defects were more open and obvious compared to the silent and hidden refrigerator dangers. Smoke or fire emanating from a dishwasher control slide is a clear sign of danger. But the health and safety risks associated with the defective refrigerators are far more insidious and undetectable until it is too late.

    **2.1.6.1.**    One-third of the consumers who have communicated directly with me, describe temperature control problems such as: wildly fluctuating temperatures that cannot be adjusted by manual controls, food items 'feel' too warm, food spoils rapidly (particularly dairy items and luncheon meats), food in the freezer compartment thaws then re-freezes, food items freeze in refrigerator compartments then rot as they thaw.

    **2.1.6.2.**    When advised to use a refrigerator thermometer, consumers are discovering unsafe temperatures of over 50 or 60 degrees in the refrigerator compartment. Food stored above 40 degrees is unsafe and places families at risk for food poisoning.

    **2.1.6.3.**    The choking hazard from the defective icemakers presents as clear or white plastic shards dispensing from the ice chute in the freezer door. We have more than 200 reports of consumers who have coincidentally discovered these virtually invisible shards in their beverages. Children and the elderly are at particular risk for choking.

**2.1.7.**  Objector itemizes these health and safety issues to reinforce the gravity of a notice that includes clear and cautionary language so that consumers can protect themselves and their family members from illness and injury.  Both Plaintiff and Defendant were and are well aware of these health and safety issues.  Yet both parties agreed to omit any and all consumer warnings.  In six pages of relatively fine print with more than a half page devoted to releases benefiting the Defendant, not one sentence was devoted to a cautionary warning to consumers as to the public health and safety hazards associated with the defects that may be present in their own homes.  Health and safety concerns are the one issue that should never have been compromised in the *compromise* Settlement Agreement.

**2.2.**     *Objector objects to the approval of this settlement because such sweeping releases from complaints/claims not asserted in the class action, will strip away my right and the rights of the settlement class to file complaints with appropriate state and federal authorities for Defendant's acts of unlawful behavior including but not limited to racketeering, fraud, conspiracy, consumer fraud, negligent misrepresentation and omission, and intentional misrepresentation and omission. Certain unlawful acts that the Defendant engaged in were never purported by class counsel to be represented in the complaint as a claim.*

**2.2.1.**  Class Counsel agreed to a scope of Release for the Defendant that encompasses not simply the claims asserted in the class action complaint, but any and all claims related to any issue with the refrigerators and Defendant's behavior, now and in the future.  This leaves members stripped of all the rights and protections that federal and state laws provide to consumers.  The breadth

of the Release renders the Settlement unfair, as the settling parties should not
be allowed to release claims for which they were never authorized to represent
the class, and for which are not listed in the Complaint.  The Release grants
insulation to G.E. against any claim made, or complaint filed by a member for
any of the following:  claims for breach or violation of any federal, state, or
local statute, regulation or ordinance, case law, common law, or other law.
Any claim based on racketeering, fraud, conspiracy, consumer fraud, negligent
misrepresentation/omission, or intentional misrepresentation/ omission.
Certain unlawful acts that the Defendant engaged in were never purported by
Class Counsel to be represented in a complaint as a claim.  Therefore, Class
Counsel should not be allowed to execute a release of those complaints/claims
not asserted in the class action.

**2.3.**     *Objector objects to the approval of this settlement because the settlement's
over-broad release strips class members' defenses and claims with respect to claims
that have yet to accrue, be realized, or brought because certain events, giving rise to a
right and a claim, may not yet have occurred.*

**2.3.1.**  There are class members who have not yet scheduled a moisture-related
repair because of the anticipated expense the G.E. Customer Service
Representatives warn them they may be or will be responsible for, even though
their model and serial number squarely places them in the settlement class.

**2.3.2.**  There are class members living with the inconvenience of the defects
who are in need of repair(s) and have not even attempted to schedule a repair
service call with G.E. (or anyone else) due to the anticipated expense.  In our

experience, these are usually individuals who can least afford a $200 or $300 repair bill because they are living on fixed incomes.  This includes senior citizens, young families with children, people living on disability income, etc.

**2.3.3.**   There are class members who have no knowledge of the lawsuit or settlement and their right to secure the extended warranty for future repairs. They will suffer and realize too late that all of their valuable defenses and rights have already been released should a disaster with their refrigerator occur.  A common occurrence is the flooding of kitchens or entire homes.  In the two examples to follow, there are no warning symptoms of the pending disaster.

**2.3.3.1.**    On a day and time impossible to predict, a water filter in the refrigeration compartment will suddenly rupture causing torrents of water to continuously flow through the refrigerator compartment, down through the door gasket, through the home and into the streets.

**2.3.3.2.**    In other cases, the electronics behind the control panel on the exterior of the freezer door will short out due to moisture damage and the water dispenser will spontaneously open causing an unabated flow of water similar to the ruptured water filter example.

**2.3.4.**   Having no knowledge of the lawsuit and their right to register for benefits, or opt-out, all rights to future unaccrued claims and defenses will be gone before the event and facts giving rise to the claim are realized.  This settlement includes, in practical effect, a declaratory judgment action by which

G.E. seeks to adjust all of its unaccrued liabilities, including those that could arise in the future.

**2.3.5.** The unfairness of the so-called finality that G.E. seeks is exemplified by the fact that G.E. knows *exactly* how many of these refrigerators were manufactured. Therefore, even under a worst case scenario, G.E. can easily measure their maximum liability for benefits to class members without placing unreasonable time limitations upon those class members.

**2.3.6.** G.E. is one of the most powerful and profitable corporations in the world. They can easily withstand the expense and liability of correcting the defects of all units manufactured and included in this Settlement Agreement without placing artificial time limits on a disadvantaged class of consumers.

**2.4.** *Objector objects to the approval of this settlement because General Electric's role as administrator of its own notification program and claims processing is tantamount to granting General Electric free license for deciding whether class members qualify for benefits and is operating to the disadvantage of class members. General Electric is redefining and rewriting the definition of moisture-related problems and repairs, and has a financial incentive to determine that class members do not qualify for settlement benefits.*

**2.4.1.** In the weeks leading up to the April 27, 2006 Fairness Hearing, I became aware of the following through direct communications to the website and telephone calls and emails to me personally that:

**2.4.1.1.** Too many consumers had not received Settlement Notification packages despite receiving prior repairs from G.E.

**2.4.1.2.**   Too many class members did not receive Settlement Notification packages in time to meet Court mandated deadlines, despite contacting the G.E. Settlement Office and specifically requesting them in time.

**2.4.1.3.**   The specific telephone number provided by G.E. for Settlement Class Members often trapped consumers in automated "loops", excessive hold times of 30 minutes or more, repeated disconnections, and failed attempts to speak directly with a Customer Service Representative as promised.

**2.4.1.4.**   Members were being denied refrigerator replacements (as provided for in the Settlement) despite having the three or more documented moisture-related service calls.

**2.4.1.5.**   Consumers who were unaware of the Settlement and called G.E. for service on a model included in the Settlement, were not informed by the G.E. Customer Service Representative that their moisture-related repair was part of a repair program or Settlement Agreement and would be performed at no cost to them.  Rather, they were told to expect a minimum service call charge, plus the cost of parts and labor.

**2.4.1.6.**   Only those consumers who received direct mail notice, or knew the specific Settlement Call Center telephone number, or

discovered the existence of the lawsuit via the internet, or word of
mouth had attempted to participate in benefits.

**2.4.1.7.**     It appeared that most, if not all authorized G.E. repair
companies were not aware of the Moisture Program and/or not
informed about the Settlement with its benefits and remedies available.

**2.4.1.8.**     Despite the existence of the G.E. Moisture-Related
Settlement web page (www.geappliances.com/classaction), unless a
consumer has foreknowledge of the exact web page address, it is very
difficult for the average consumer to find the page.   There are no
announcements, notices, or links from the G.E. appliance home page
directing consumers to the Moisture-Related Settlement web page.

**2.4.2.**   All of the aforementioned problems (2.4.1.1. through 2.4.1.8.) continue
to the current day.  To further complicate matters, there are a host of other
problems interfering with members' receiving promised benefits.

**2.4.2.1.**     G.E. is granting only a limited number of class members the
promised benefits by informing many of them that their previous
repairs were not moisture-related (when in fact they were) or that
previous repairs in G.E.'s service records do not match the member's
records.

**2.4.2.2.**     G.E. requires written proof of previous moisture-related
repairs.  Since G.E. does not issue receipts for warranty repairs, it is
G.E.'s 'word' against the word of the class member.  If the repair was

paid for by the class member, G.E. will not accept as proof a cancelled check or credit card receipt unless the part numbers and service numbers are detailed on the check or receipt.  G.E. is at a further advantage in that the receipts they issue in the field for consumer-paid repairs are printed on thermal paper which fades to an unreadable state very rapidly.

**2.4.2.3.**   The benefits awarded in the settlement are keyed to the definition of "Moisture-Related" problem.  The definition was delineated in Doc.53-1, filed 12/12/2005:

> *Moisture-Related Problem means a mechanical and/or insulation issue, as diagnosed by G.E., that causes excessive moisture in a refrigerator that may result in one or more of the following symptoms: frost build-up in the freezer or the dispenser chute, ice not dispensing at all, ice cubes frozen together in a solid mass in the ice bucket, auger in the ice bucket not turning, water dripping from the door onto the base of the refrigerator compartments or onto the floor, mold and/or rust in either the fresh or freezer compartment or on the door, a noisy freezer fan, nonfunctional defrost heater and/or crushed ice or only cubed ice.  Moisture-Related Service Call means a service call for the purpose of correcting or repairing a Moisture-Related Problem.  In diagnosing a Moisture-Related problem, G.E., in its discretion, may review documentation or other information obtained from the claimant, or may rely on an inspection of the refrigerator by a G.E. Factory Service Technician or G.E. Authorized Customer Care Service Center.*

The <u>Notice of Proposed Class Settlement</u> further states:

*Moisture-Related Problems that may result in: (1) the formation of excessive moisture, especially in the icemaker compartment, which causes, among other things, condensation, moisture, or possible deterioration; (2) wavering temperature controls; (3) excessive frost; and (4) related problems.*

Members who have the defects and symptoms described above, are being informed by the G.E. Moisture Settlement Office that their frost, moisture, rust, defrost heater problems, etc. are not moisture-related, and therefore do not qualify for benefits.  When members ask the Customer Service Representative to describe what parts or repairs would constitute "Moisture-Related", they are not given an answer or explanation; only a denial of the claim.  As a result, refrigerator replacements, refunds, or reimbursements are being refused that should be granted.  Members are confused, upset, and angry.  For the Court to allow a civil defendant to evaluate and administer the relief afforded to its victims, is resulting in a miscarriage of justice and further harms class members.

**3.     Objection to Approval of Appointment of Lead Settlement Class Counsel**

**3.1.**     *Objector objects to the approval of the appointment of Lead Settlement Class Counsel because he failed to fairly and adequately represent and litigate the interests and claims of Objector and other class members.*

**3.1.1.**  *Lead Settlement Class Counsel failed to negotiate inclusion of protective clauses and monitoring mechanisms to insure proper administration of the notification process and claims administration program.*

**3.1.2.**   *Lead Settlement Class Counsel ignored information provided to him by Settlement Class Representative before the original complaint was filed with the Court that strongly suggested Plaintiff's inappropriate status as Settlement Class Representative.*

**3.1.3.**   *On April 27, 2006 during the Fairness Hearing, Lead Settlement Class Counsel represented to the Court that Objector was not a member of the Class. Despite two written requests to Lead Settlement Class Counsel for clarification of his opinion of my status as a class member, he has refused to confirm or correct his previous representation to the Court.*

**3.1.4.**   *As of this date, Lead Settlement Class Counsel has not responded to me or answered my questions thereby jeopardizing my right to take necessary and appropriate action in a prompt manner in order to protect my interests.*

**3.2.**   *Objector objects to the approval of the appointment of Lead Settlement Class Counsel because he has not availed himself of certain facts and evidence readily available in the public record.*

**3.2.1.**   *A 2500+ page report with evidence in the custody of the Florida Attorney General, Office of Economic Crime, Tampa, Florida.*

**3.2.2.**   *A 550 page complaint report filed with the Federal Trade Commission.*

**3.2.3.**   *A 550 page complaint report filed with Florida Department of Agriculture and Consumer Services.*

**3.3.**   *Lead Settlement Class Counsel has ignored electronic and telephonic communications and deliberately avoided receipt of questions, information, and evidence that may have and could have a direct effect on any settlement agreement entered into or approved by this Court.  Concealment of material facts and information relative to the class action may influence, obstruct, and impede the ability of the Court to assess and determine the appropriateness of approving the lawsuit and the settlement agreement.*

**3.3.1.**  For more than a month prior to the Fairness Hearing, I repeatedly informed Mr. Weinstein of problems rampant with the Notification Program, resulting in serious and numerous omissions of consumer databases <u>I knew existed</u>.  I delivered (via email, telephone, and facsimile on April 24, 2006) the names and locations of G.E. databases containing Settlement members' contact and history information.  In addition, I informed Mr. Weinstein that G.E. was not providing the agreed upon benefits to class members and were in fact, continuing to mislead class members and corrupting the settlement process.

**3.3.2.**  I decided to attend the Fairness Hearing of April 27, 2006 with the intention of addressing my concerns with the database problems to Mr. Weinstein in person.  Suffice to say, Mr. Weinstein was not receptive.  As a result, I concluded that I needed to speak with the Judge.  When I inquired about the procedure, I was informed I needed to be on the docket.  In order to be on the docket, I had to file a document.  The only *document* I had with me was my discussion notes.  Therefore, I filed the notes as a Plea with the Court (later referred to as a late objection).

**3.3.3.**  When the Hearing commenced, Mr. Weinstein stated to the Court that G.E. had revealed to him only moments before, that there was "a database problem".  This is not true.  I informed Mr. Weinstein of the problem weeks before the Hearing.  I also forwarded the detailed information to him via email and facsimile on April 24, 2006.  Willful avoidance of evidence critical to this

case and to the due process rights of the members should not be tolerated by this Court.

**3.3.4.**   Mr. Weinstein failed to include other models in the Settlement Agreement known to have the same defects.  On more than one occasion (the latest being April 11, 2006 in an email communication), Mr. Weinstein declared to me that a new class action lawsuit would be filed on or about June 1, 2006 to cover the excluded and defective models.  But as of this date, he has not filed a new lawsuit.

**4.**      **Objection to Approval of Appointment of Settlement Class Representative**

**4.1.**      *Objector objects to the appointment of Settlement Class Representative because he failed to publicly disclose to Settlement Class Members his past business and political relationships and encounters with the Defendant, which renders his representation of the class questionable.  A conflict of interest appears to be present.*

**4.1.1.**   Settlement Class Representative's professional associations include Duhamel Broadcasting Group an affiliate of all three major television networks; Chairman of the Board of Directors for the National Association of Broadcasters; played a major role in the defeat of the so-called "transfer tax" on the sale of broadcast properties; former head of Forward Communications; Chairman of ABC Television Affiliates; IBA Legislative Liaison Chair acting as chief spokesperson before Congress and the FCC and lobbying extensively; former employee of General Electric Company/NBC.

**4.1.2.**   At the Fairness Hearing of April 27, 2006 Plaintiff blamed class members for not registering for benefits, when the issue being discussed

concerned missing databases containing the names of class members and insufficient notification. How the Plaintiff could blame class members for something they had no knowledge of or control over, was not their fault, and which greatly and adversely affected them, is beyond comprehension. Further, Plaintiff defended the Defendants after blaming the members he supposedly represents.

5.     **Objection to Approval Of Attorneys' Fees**

**5.1.**     *Objector objects to the Approval of Attorneys' Fees because Settlement Class Counsel failed to fairly and adequately represent and litigate in the best interests of the Class. Class Counsels' inadequate representation has resulted in the vast majority of class members being placed in a far worse position than they would have been, had the litigation never been brought in the first place.*

6.     **Conclusion**

**6.1.**     *For the foregoing reasons, this Objector submits that approval of the Settlement Agreement, approval of the Appointment of Lead Settlement Class Counsel, approval of the Settlement Class Representative, and approval of Attorneys' Fees is not fair, adequate, or reasonable. In light of the significant benefits that should be available to the class members under the terms of this Settlement Agreement, actual disparate treatment of the class members dramatically highlights just how bad the class action settlement is for the vast majority of the class members who are getting almost nothing, but losing all of their claims and defenses. This class action settlement is in need of a serious overhaul, from the discovery process, to the negotiation of the compromise agreement and settlement terms, to the performance of the notification process, and to the administration of the claims process including the distribution of benefits (or lack thereof) to the class members.*

**6.1.1.**  The history of this case is disquieting and the matters too important to ignore.  General Electric Company is a notorious offender of laws and consumer rights.  They have historically engaged in and continue to engage in unfair and deceptive practices against the members of this class.  The fact that the Defendant is charged with adjudicating the Class Members' rights under the Settlement is resulting in violation of Class Members' rights.  This case demands an independent adjudicatory body to administer class action benefits to insure procedural safeguards, thereby guaranteeing due process to the claimants.  G.E. has been the subject of many lawsuits because of their demonstrated inability to obey the law, and there is no reason to believe that G.E. will be any more reliable when asked to police itself under this Settlement.  For a Court to allow a civil defendant to be fair in evaluating and administering the relief to be afforded to its victims would be a miscarriage of justice.

**6.1.2.**  Class Counsel has not adequately protected the interests and rights of the members despite being aware of G.E.'s notorious and well documented dishonesty and mistreatment of the Class Members who own these refrigerators.  Despite this history, Class Counsel allowed the Defendant through the Settlement Agreement to enjoy total control over the administration of remedies and restitution to their victims, and failed to insert protective clauses to insure that proper administration of the notification process and claims administration would be performed legally and fairly.

General Electric's execution of the notification program and performance of the claims administration process has been, and continues to be, disturbingly fraught with problems. Only a narrow category of Class Members are realizing the maximum relief under the Settlement, thus the benefits of the Settlement to the Class is no longer commensurate with the broad relief the Defendant will enjoy. The limited benefits actually being received by Class Members is particularly troubling because G.E. has profited (and continues to do so) greatly from its wrongdoing, and has enriched itself unjustly.

**6.1.3.** The lack of reasonable explanation for errors and omission that have occurred, combined with the injustice levied upon class members by the Defendant, raises the specter of a bad faith effort put forth and creates a cloud on the judicial process of this lawsuit. To rely on attorney argument to approve this Settlement would deny due process rights to the Class Members who have not had fair and adequate representation in this lawsuit.

Dated: August 16, 2006                    Respectfully submitted,

Catherine T. Cannivet
Pro Se
3995 Upolo Ln
Naples, FL 34119
(239) 592-5454
(239) 592-5858 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing to be furnished by facsimile (except for Mr.Bogard) and U.S. mail to the following counsel this 16th day of August 2006.

**Counsel for Plaintiff**

Scott W. Weinstein
Weinstein, Bavly & Moon, P.A.
2400 First Street, Suite 303
Fort Myers, FL 33901
Facsimile: (239) 334-1289

Gary E. Mason
The Mason Law Firm, P.C.
1225 19th Street, N.W., Suite 500
Washington, D.C. 20038
Facsimile: (202) 429-2294

Alexander E. Barnett
The Mason Law Firm, P.C.
One Pennsylvania Plaza, Suite 4632
New York, NY 10119
Facsimile: (917) 591-5227

Jonathan W. Cuneo
Cuneo, Gilbert & LaDuca, L.L.P.
317 Massachusetts Avenue, N.E., Suite 300
Washington, D.C. 20002
Facsimile: (202) 789-1813

William M. Audet
Alexander Hawes & Audet, L.L.P.
221 Main Street, Suite 1460
San Francisco, CA 94105
Facsimile: (415) 576-1776

**Counsel for Defendant**

Edward M. Waller, Jr.
Fowler White Boggs & Banker, P.A.
501 East Kennedy Boulevard, Suite 1700
Tampa, FL 33601
Facsimile: (813) 229-8313

Hal N. Bogard
Senior Litigation Counsel
GE Consumer & Industrial
Appliance Park
Building 2-225
Louisville, KY 40225
Telephone: (502) 452-3395
Facsimile: Unavailable
Sent via USPS 1st Class Mail only

*Catherine T. Cannivet*

Catherine T. Cannivet
Pro Se